# BROEGE, NEUMANN, FISCHER & SHAVER, LLC
## ATTORNEYS AT LAW

TIMOTHY P. NEUMANN
PETER J. BROEGE
FRANK J. FISCHER
DAVID E. SHAVER
GEOFFREY P. NEUMANN
------------------------
*of counsel:*
CARL BROEGE

OLD SQUAN PLAZA
25 ABE VOORHEES DRIVE
MANASQUAN, NEW JERSEY  08736

TEL: (732) 223 - 8484
FAX NO. (732) 223 - 2416
EMAIL: TNEUMANN@BNFSBANKRUPTCY.COM

September 28, 2021

***VIA ECF***

Hon. Christine M. Gravelle, USBJ
US Courthouse
402 East State Street
Trenton, NJ 08608

**Re:    Carolyn Brown; Case No. 20-20921**

Dear Judge Gravelle:

I represent Douglas Brown, a creditor by virtue of being a co-guarantor with the Debtor on several corporate loans. I write to respond to the objection (the "Objection") filed on behalf of Raymond Dietrich ("Dietrich") to the motion of Thomas Orr, the Chapter 7 trustee ("Trustee") to sell (the "Sale Motion") the 600 shares of capital stock of Browns Heating & Cooling, Inc. ("BHC") that were owned by the Debtor, Carolyn Brown, and are now property of the bankruptcy estate. The Sale Motion is supported by the certification of the Trustee (the "Orr Certification"). The Debtor, BHC and Dietrich were parties to a shareholders agreement dated July 1, 2010 (the "Shareholders Agreement").

Point I of the Objection rightly points out that the Sale Motion has confused the parent and subsidiary company and incorrectly indicates that the Debtor's stock in Brown's Gas Appliance and Furnace Service, Inc. ("BGAFS"), the wholly-owned subsidiary, is the subject of the sale. The

only stock the Trustee owns is Carolyn's stock in the parent corporation, BHC. BHC owns all of the capital stock of BGAFS. This confusion is attributable to a clerical error in the letter communicating the offer which is easily remedied and should not distract the Court from consideration of the merits. Everyone in this case knows that the Trustee is selling the Debtor's stock in BHC and that she owned no stock in the subsidiary.

I join in the submission of counsel for BHC and adopt its arguments and offer below additional reasons for the Court to overrule the Objection and approve the Sale Motion. This Court has already decided that Carolyn's stock in BHC can be purchased by BHC and the Objection appears to be surreptitiously seeking reconsideration of that determination. Furthermore, whatever interest Dietrich might have in the stock to be sold at the very least is the subject of a bona fide dispute. Under the Shareholders Agreement, Dietrich could also be compelled to accept a money satisfaction for his interest in BHC. As such, the stock might be sold pursuant to either  section 363(f)(4) or (5) of the Bankruptcy Code.

*In re Mundy Ranch, Inc*., 484 B.R. 416, 422 (Bankr. D.N.M. 2012) is an analogous case. It too involved a shareholder dispute in a closely held corporation and there was pre-petition state court litigation in which one shareholder alleged that the other had dissipated, misapplied and/or wasted corporate assets. In ruling that the sale could be free and clear of these claims, the Court relied in part on the Third Circuit's decision in *In re Trans World Airlines, Inc*., 322 F.3d 283 (3rd Cir 2003), noting,

> A construction of "any interest in such property" under Section 363(f) that does not limit "interest in property" to in rem interests such as a lien is consistent with the language of the statute. Section 363(f) broadly refers to **any interest**." (emphasis added). Subsection (3), unlike Subsections (1), (4) and  (5), applies only if "such interest is a lien;" therefore, the term "interest" as used in Section 363(f) necessarily contemplates something broader than the term "lien". See *In re Trans World Airlines, Inc*. 322 F.3d at 290 (noting that "to equate interests in property with only in rem interests such as liens would be incompatible with section 363(f)(3), which

contemplates that a lien is but one type of interest"); *In re WBQ P'ship*, 189 B.R. 97, 105 (E.D.Va.1995) (noting that "since 'lien' is a defined term under the Bankruptcy Code, it stands to reason that Congress would have used the term 'lien' instead of 'interest,' had it intended to restrict the scope of Section 363(f) to liens," and observing that "[o]ther courts have indicated that the term 'interest' is broad, covering more than mere liens"). Moreover, such construction furthers the purpose of Section 363(f). As the Court in *In re Medical Software Solutions*, 286 B.R. 431 (Bankr. D. Utah 2002) explained:

> The authority to sell free and clear is broad because it reflects a compelling policy intended by Congress in § 363. [T]he purpose behind the free and clear language is to maximize the value of the asset, and thus enhance the   payout made to creditors. Without free and clear language, prospective buyers would be unwilling to pay a fair price for the property subject to sale; instead, the price would have to be discounted, perhaps quite substantially, to account for the liabilities that the buyer would face simply as a result of acquiring the asset.

286 B.R. 446-47 (internal quotations omitted).

Dietrich owns 100 shares in BHC and is party to the Shareholders Agreement which creates rights and duties regarding the sale of the stock in BHC. He certainly has an "interest" within the scope of section 363(f). The Court in *Mundy* ruled that because the claims of the plaintiff in the state court litigation gave rise to an interest in the property to be sold under the broad definition of interest adopted by the Third Circuit, the sale could be affected free and clear of those claims, stating, "The Court has found that the Partition Claim is an interest in the Simms Parcel, and that such interest is in bona fide dispute. The interest is in bona fide dispute because there is an 'objective basis for ... a ... legal dispute as to the validity of [Father Mundy's] asserted interest.' *In re Taylor*, 198 B.R. 142, 162 (Bankr.D.S.C.1996)." *Mundy, supra* at 416.

In Section II (A) of the Objection, Dietrich contends that the Sale Motion violates provisions of the Shareholders Agreement governing how the shares of a deceased shareholder are to be purchased and by whom. Dietrich argues that it was the intent of the parties to the Shareholders Agreement to ensure that none of the stock ends up in the hands of a third party. A more likely interpretation of these provisions is that they were designed to ensure that none of the stock being

issued to Dietrich wind up in the hands of a third party and that, but for Dietrich, all shareholders will be family members. Larry Brown is hardly an outsider. He, unlike Dietrich, is a member of the Debtor's family. What is more evident is that the Shareholders Agreement was designed to prevent Dietrich from gaining control of the company.

Section II of the Shareholders Agreement (sometimes "SA") is entitled "Control and Management." It deals expressly with the possibility of Carolyn's demise and provides that all parties are required to vote their shares so that Carolyn is always a board member, and in the event of her death, "Linda Brown shall replace her and all shares shall be voted accordingly." SA pg. 4, § II.1.b (1). This more specific provision deals expressly with the death of Carolyn and overrides any more general inconsistent provisions such as those relied upon by Dietrich at SA pg. 12, § IV.7.a (4) found in Section IV entitled "Employment Provisions," and Subsection 7 which is entitled "Termination of Employment." There would have been no need to include a section of the agreement entitled "Employment Provisions" but for the need to deal with the inclusion of Dietrich, a non-family member, into the company. Subsection 2(b) on SA pg. 10 entitled, "Evaluation of Services Performed" deals exclusively with the "Minority Shareholder" who is identified as Dietrich at SA pg. 1 in the  second Whereas clause. It states: "The Minority Shareholder agrees that his performance for the Subsidiary shall be evaluated in the sole discretion of the Principal Shareholder."

The fact that the Shareholders Agreement expressly contemplates that Carolyn shares are to be voted after her death can best be interpreted to mean that the provision in the "Employment Provisions" section that renders shares non-voting at death can only have been intended to apply

to Dietrich[1]. It is axiomatic that in the interpretation of contract language specific provisions are

to be given controlling effect over more general provisions. See, *N.J. Asphalt & Paving Co. v. Mut.*

*Boiler Ins. Co.*, 19 N.J. Super. 445, 449 (Super. Ct. 1952) ("Where there is a repugnancy between

the general clauses and specific ones, the latter will govern."). As stated in *Gil v. Clara Maass*

*Med. Ctr.*, 450 N.J. Super. 368, 378-79 (App. Div. 2017):

> General rules of interpretation require that, so long as it leads to a result in harmony
> with the contracting parties' overall objective, a specific, defined term controls a
> general, undefined term. See *Bauman v. Royal Indem. Co.*, 36 N.J. 12, 22, 174 A.2d
> 585 (1961); *George M. Brewster & Son, Inc. v. Catalytic Constr. Co.*, 17 N.J. 20, 35,
> 109 A.2d 805 (1954); *Burley v. Prudential Ins. Co.*, 251 N.J. Super. 493, 500, 598 A.2d
> 936 (App. Div. 1991). "Specific language in a contract controls over general language,
> and where specific and general provisions conflict, the specific  provision ordinarily
> qualifies the meaning of the general." *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d
> 954, 961 (Del. 2005). "Even absent a true conflict, specific words will limit the meaning
> of general words if it appears from the whole agreement that the parties' purpose was
> directed solely toward the matter to which the specific words or clause relate." 11
> Williston on Contracts § 32.10, at 744 (4th ed. 2012).

In addition, Dietrich is no longer entitled to even be a shareholder. The employment of

Dietrich was terminated for cause on July 25, 2017 and effective August 1, 2017 by email from

Doug Brown which he cannot dispute. SA pg. 14, § IV.9(a). As explained in more detail anon, at

this juncture, all that Dietrich possesses is a right to have his shares purchased by BHC at a price

to be judicially determined, which could in fact be zero. SA pg. 15, § IV.10.

The preference for family over Dietrich is evident from other provisions in the agreement.

Section II entitled "Control and Management." Section II 1 on page 3 states: "<u>Board of Directors</u>.

Carolyn shall serve as the Sole Director of the Corporation." Section II b. on pgs. 3-4 is entitled

"Designation of Directors" and states,

---

[1] Additionally, as will be discussed in detail below, the provision purporting to render the shares
non-voting upon death is inconsistent with the immediately preceding provision of the
Shareholders Agreement.

The parties, including the Trustee of the Voting Trust, shall vote their shares so that the Board of Directors of the Corporation shall at all times include Carolyn Brown, in the event of Carolyn Brown's death or disability, Linda Brown shall replace her and all shares shall be voted accordingly.

Section II 1(c) (2) on p. 4 states:

All matters to be voted on by the board of Shall be approved, unless explicitly provided to the contrary in another provision of this Agreement, by: ( a ) Two-Thirds (2/3) of the directors then serving where the matter is not characterized as a "Major Decision" as defined below.

By virtue of this provision, if Dietrich  were ever to become a director, he could never alone make decisions. At least one member of the board would have to be a family member, and if they were two directors, nothing could happen absent unanimity. This of course could quite easily give rise to deadlock. The agreement contemplates that possibility in Section II (d) on pg. 4,  entitled "Deadlock of Board of Directors," which states:

In the event that the Board of Directors consists of two or more Directors and is deadlocked, the first person listed in this provision who was able and willing to make a decision to resolve such deadlock shall do so in Notice to the Board of Directors. Such Notice as defined below shall be binding on the Directors and the Corporation:

(1) Carolyn Brown
(2) Linda Brown
(3) Douglas Brown
(4) Raymond Dietrich

(a)  The above persons, if not already a Director, shall be referred to as the temporary Directors. If an event occurs which triggers the appointment of a Temporary Director, as defined below and shall, so long as employed by the Corporation assume responsibility of daily business affairs of the Corporation.

(b) In the event of the disability of their Principal Shareholder or any legal requirement to appoint additional Directors the Designee of the Principal Shareholder and if required more than one such person shall serve as a Temporary Director.

Here the preference for maintaining family hegemony is obvious. Dietrich is at the very bottom of the decision-making totem pole. The notion that Larry Brown, the brother of the Debtor, is a "third party" is not accurate. More importantly, this provision effectively puts Douglas Brown

in charge of the corporation. Doug was one of two directors when Carolyn was alive and is the sole director at present. Carolyn is deceased which automatically replaced her with Linda. Linda has chosen not to serve but has approved Douglas serving in her stead. This is a Brown family business and Dietrich is the real third party.

Dietrich cannot possibly serve as a director. While Dietrich may contest whether he violated noncompete restrictions, he cannot contest whether he was terminated. SA., Section II 3 on page 5 is entitled,  "Immediate Resignation if Officer or Director Terminated" and states:

> In the event of the termination of the Employment or Share ownership of any Minority Shareholder, **for any reason whatsoever**, such termination shall immediately result in the automatic resignation of such Minority Shareholder as an Officer and Director of the Subsidiary and the Corporation and the Minority Shareholders designate the Corporation as Agent to effect same as provided under the provision below "Appointment of Corporation as Attorney In Fact To Facilitate Termination of Shareholder." *(emphasis supplied)*

Thus, even were Dietrich the sole voting shareholder, he could not elect himself to the board. It is obvious that the intention was to prevent Dietrich under any circumstances from controlling the corporation as he is trying to do in his Objection.

In Section II (B) of the Objection, Dietrich argues that the price offered violates the Shareholders Agreement which he contends mandates a price of $500 per share. Were that true, the Trustee would be unable to sell the stock, because the company is in financial distress, and no one in their right mind would pay $300,000 for the stock. If forced to accept a minimum of $300,000, the Trustee would probably have to abandon the stock, in which case, it would go back to the decedent's estate of Carolyn.  This would make no sense.

This provision in the Shareholders Agreement was obviously intended for the benefit of the party selling the stock. Other shareholders derive no benefit from whether the stock is sold for more money. To the contrary, the less the company pays for the stock the better from the perspective of the

7

remaining shareholders. They own shares in an entity that has more cash than it otherwise would. The Trustee now stands in the shoes of Carolyn. Carolyn certainly would have been in a position, were she alive and not in bankruptcy, to waive the benefit of that contractual provision in the Shareholders Agreement and agree to accept less money. The Trustee by filing the instant motion has done exactly that. Dietrich has no standing to insist that the company pay more money for the stock. The less the company pays, the more he benefits. The Trustee, standing in the shoes of Carolyn, can waive strict enforcement of the Shareholders Agreement and has agreed to accept less money for the shares.

In Section III (A) of the Objection, Dietrich contends that the Sale Motion violates Article II, Paragraph 5, Section B of the BHC Shareholder Agreement requiring majority approval of all shareholders of BHC who are not then disabled or deceased to approve certain major decisions. He ignores Section VII of the Shareholders Agreement which is entitled "Voting Trust." It states: "Until such time as restrictions on all shares issued through the Plan are released or lapse, such issued shares and shares remaining in the Plan shall be voted by Carolyn Brown, her agent, trustee or personal representative." This sentence can only mean that the shares held in the Stock Bonus Plan continue to vote, notwithstanding Carolyn's death. Again, this more specific provision should prevail over the more provision in Subsection (A)(4) that deal generally with voting rights upon death generally. Either the Trustee or perhaps the executor of her estate stands in the shoes of Carolyn and can vote the shares of the Stock Bonus Plan. At best, Dietrich owns 100 shares, and 300 shares remain in the Stock Bonus Plan. The Trustee is the movant and is obviously in favor of the Sale Motion and outvotes Dietrich. Additionally, for reasons explained below, Dietrich should have no voting rights; only a right to be bought out, possibly for little or nothing.

In Section III (A) of the Objection, Dietrich contends that the Sale Motion violated provisions of the certificate of incorporation of BHC, including the provisions regarding the total number of

authorized shares of BHC that can be issued and the preemptive rights of Dietrich. Although BHC is a Delaware corporation, the Shareholders Agreement provides at subsection K on page 40 that it is to "be construed in accordance with the substantive law of New Jersey."[2]

It affords to each shareholder preemptive rights to purchase any "additional, unissued or treasury shares. . . now or hereafter to be authorized."  Dietrich argues that his preemptive rights will be violated if Larry Brown is issued shares. That is not accurate. Larry Brown will acquire shares presently owned by the Stock Bonus Plan which are subject to the Voting Trust. No additional shares above the 1000 authorized by the certificate of incorporation will be issued, and Dietrich has no preemptive right with respect to outstanding shares.

Dietrich's error is understandable because the Orr Certification is inaccurate in its characterization of the transaction. At Paragraph 20, the Trustee mistakenly states that Larry Brown is to receive 300 shares of  "previously unissued company stock." The 300 shares Larry Brown will receive are presently issued and owned by the Stock Bonus Plan. The Shareholders Agreement at Section 1 (3)(B) at pg. 2 specifies that 400 shares are owned by the Brown Heating & Cooling, Inc. Stock Bonus Plan ("Stock Bonus Plan"). Article VII of the Shareholder's Agreement is entitled "Voting Trust" and provides that the shares owned by the Stock Bonus Plan shall be voted by Carolyn, "her agent, trustee, or personal representative." 100 of those shares were apparently  transferred to

---

[2] Corporations are creatures state statutes. Whether a contractual provision purporting to override the very statute which created the corporation is enforceable is doubtful. For present purposes, it is assumed that there is no conflict between Delaware and New Jersey corporate law. The right to argue that Delaware controls however is reserved. The Delaware Supreme Court has approved the sale of shares in the case of deadlocked corporations under circumstances even though not expressly authorized by statute or agreement. *Shawe v. Elting*, 157 A.3d 152 (Del. 2017).

New Jersey law recognizes the validity of shareholder agreements restricting the sale of corporate stock. "Such restriction shall be valid only if imposed by the certificate of incorporation or by-laws or by the provisions of an employee benefit plan permitted by Chapter 8 of this act, or by a written agreement among any number of shareholders or among such holders and the corporation." N.J.S.A. § 14A:7-12.

Dietrich as Schedule A/B 19 of the bankruptcy schedules lists Carolyn as owning 90% of BHC, referring presumably to her 600 shares now being sold and the remaining 300 shares owned by the Stock Bonus Plan and held by her in the Voting Trust. It is the 300 shares owned by the Stock Bonus Plan which will be transferred to Larry Brown and the transfer of those shares to Larry Brown will not violate the certificate of incorporation  or trigger preemptive rights because those shares are already issued and outstanding.

Section 14(A) of the certificate of incorporation provides that:

The initial board of directors shall consist of at least one director named herein below and paragraph 16th. Thereafter, the board of directors shall consist of one representative of management at one representative of debenture holders. The directors shall serve three-year terms."

Paragraph 16th of the certificate of incorporation names Carolyn Brown as the first director.

Section 14B entitled "Supermajority Approval to Enact Fundamental Corporate Changes" states:

Notwithstanding any other provision of this Certificate of Incorporation, the affirmative vote of the holders at least 80% have the outstanding shares of capital stock of the Corporation entitled to vote shall be required to approve: (1) any sale, lease or exchange of all or substantially all of the property and assets of the Corporation, including its goodwill at its corporate franchises: (2) any action taken to dissolve the Corporation; (3) any merger or consolidation of the Corporation with any other corporation, joint-stock or other association, trust or enterprise; (4) any change in authorized capital; (5) the removal of a director other than for cause; or (6) the amendment, change, elimination or repeal of Article Fourteenth of this Certificate of Incorporation.

The proposed sale of stock to Larry Brown will not violate this provision of the certificate of incorporation. It involves a sale of stock by the Stock Bonus Plan to Larry Brown and a loan from Larry Brown to BHC. Although the loan is not in the ordinary course, it is not an event triggering section 14B of the certificate of incorporation and requires only majority shareholder approval.

Point II of the Objection is in multiple parts. It contends that the proposed sale violates Article IV, paragraph 7, sections (A)(3) and (A)(4) and Article VIII paragraph 3A of the Shareholders

Agreement which, according to the Objection, should control how the shares must be sold and to whom. It also contends that the proposed sale violates Article VIII of the Shareholder Agreement regarding the price to be paid.

As noted previously, Article 4 is entitled "Employment Provisions." The Sale Motion deals with the sale of stock and has nothing to do with employment. Paragraph 7 of Article 4 is entitled "Termination of Employment." Again, this section of the Shareholders Agreement deals with employment and not the sale of stock. Subsection A is entitled "Death of Employee." The Court has ruled that BHC can purchase the stock pursuant to  Subsection A(3) which states that the shares of a deceased shareholder shall be repurchased by the Corporation. Dietrich relies on Subsection (A)(4) on pg.12. Subsection A(4) states that upon death, stock of the decedent immediately becomes nonvoting shares and shall be bequeathed to a trust for the benefit of the decedent's children. This directly contradicts Subsection A(3). The same shares cannot simultaneously be transferred to a trust and purchased by the corporation. The Court, in its previous ruling, has enforced Subsection A(3), and implicitly rejected Subsection A(4), which is inconsistent with Subsection A(3).

Carolyn Brown died after she filed bankruptcy. By operation of the Bankruptcy Code, her shares became property of the bankruptcy estate when she filed her petition. Enforcement of Subsection A(4) would also conflict with the Bankruptcy Code because it would elevate the heirs of Carolyn Brown above her creditors. If Subsection A(4) is binding on the Trustee, then all of it is, and the shares are beneficially owned by Carolyn's children, not the bankruptcy estate. Her heirs could not force the Trustee to turn the shares over to a trust. This subsection cannot possibly apply in the context of this case because it would violate the Bankruptcy Code. Because this clause cannot be enforced against the Trustee, and the shares are part of the bankruptcy estate, the provision that they become nonvoting cannot be enforced either. The Trustee, by filing the Sale Motion, has obviously approved

the sale to Larry Brown and predicating the opposition to the sale on the theory that the shares are non-voting under Subsection A(4) makes no sense.

Clearly, the exegesis of the Shareholder's Agreement advanced by Dietrich is flawed and at the very least, in bona fide dispute. In addition, under the provisions of the Shareholders Agreement, Dietrich could be compelled to accept a money satisfaction for his interest. Subsection C entitled "Termination for Cause" states: "If an Employee is terminated for cause, any Shares owned by such Employee shall be purchased by the Corporation and the remaining Shareholders as provided below." While Dietrich protests whether valid cause existed for his  termination, the Shareholders Agreement makes the board the final arbiter of that determination. Because of the existence of a bona fide dispute, and because Dietrich could be compelled to accept money for his interest in the corporation, both subsections  four and five of section 363(f) are satisfied.

Dietrich argues that the shares that were owned by Carolyn  became nonvoting shares at the time of her death, and that consequently he is the owner of the only shares that can vote. As noted above, he relies upon the provisions of Subsection A(4) which are inconsistent with  Subsection A(3) and the Court has already ruled that the sale is pursuant to Subsection A(4). This argument also ignores the fact that the shares of the Stock Bonus Plan held by the Voting Trust continue to vote, notwithstanding the death of Carolyn,  and there are three hundred of those shares as opposed to the 100 ostensibly owned by Dietrich.

Dietrich contests the allegation that he has no continued right to share ownership because he was terminated for cause. He contends that there is nothing in the Shareholders Agreement which so provides. In fact, Subsection 7(c) on pg. 12 entitled "Termination for Cause," states: "If an Employee is terminated for cause, any Shares owned by such Employee shall be purchased by the Corporation and the remaining Shareholders as provided below."

Subsection 9 on page 14-15 of the Shareholders Agreement, entitled "Consequences to Employee of Firing for Cause" states, at subparagraph (a):

> The decision as to whether there is cause shall be determined by an affirmative finding of cause by the members of the Board of Directors and the first person on the list set forth in the provision above governing a deadlock of the Board of Directors.

Dietrich was terminated by the board and that decision is not by its terms subject to judicial review. Therefore, he can be compelled to sell his shares. This is the family saying to Dietrich, if we decide you did something wrong, we can buy you out, whether we are right or we are wrong, and we are not going to allow a court to prevent us from doing that. Subsection 9 on page 14-15 of the Shareholders Agreement, entitled "Consequences to Employee of Firing for Cause" does allow for judicial review of whether there has been a violation of noncompete restrictions in the Shareholders Agreement which affects only the price Dietrich is to receive for his shares. It states at subparagraph (c)2:

> The percentage of Stated Value equivalent to the ownership interest in full payment of any stock such person owns in the Corporation, payable over four years, in quarterly installments beginning on the first day of the first full month following the month of such firing. If a person fired for cause violates the noncompete provisions contained in this Agreement, and such violation is determined by a Court having proper jurisdiction, in addition to any other remedies, the purchaser of such Shares under this provision may cease making payments under this provision. search payment shall be first reduced by the repayment of loans to the Shareholder from the Corporation, Subsidiary, or purchasing Shareholders. Any balance that remains outstanding after being credited as provided in the preceding sentence, shall pay be paid off over quarterly over four years at the interest rate provided for similar payments under section 1274.

Subsection 10 on page 15 is entitled "Reduction in Buyout for Violation of Restrictions." It states:

> If any former Shareholder whose shares were sold to the Corporation or other Shareholders pursuant to this agreement is being paid on incremental basis and is discovered to violate restrictions the amount which such Shareholder shall be entitled to shall be reduced to the lesser of that Shareholder's actual cost for Such shares or the Stated Value, calculated as of date of such former Shareholder's termination as a Shareholder, which value shall be deemed to be inclusive of all goodwill. All payments made to such former Shareholder shall be deemed payments on account of such amount.

13

If payments exceed such amount then the former Shareholder shall refund the differences within Thirty (30) days. Should former Shareholder any money to the Corporation, Subsidiary or Shareholder such amount shall become immediately due and payable.

The combined effect of these provisions of the Shareholders Agreement, simply stated, is that an employee who was fired for cause, as determined solely by the board, can be forced to sell his shares. If it is determined by a court that he violated noncompete restrictions contained in the Shareholders Agreement, he receives only what he paid for his shares. It is alleged that he violated restrictions in the Shareholders Agreement. If that is true, the most Dietrich might be entitled to is the amount he paid, apparently $1,000 at most. In any event, because he was fired for cause which he cannot dispute, his only rights under the Shareholders Agreement are to receive a buyout. He certainly has no voting rights.

Dietrich argues that he was never notified that his shares were to be bought out or that they became non-voting. Nothing in the Shareholders Agreement requires him to be notified. He signed the agreement and he knows he was terminated for cause. Notification is not a condition precedent to these provisions taking effect. He also argues that he should have been receiving payments if in fact he was to be bought out. That argument is specious, because the amount of those payments cannot be determined until it is determined whether or not Dietrich violated the noncompete restrictions which may eliminate any payment he otherwise might be owed. That is an issue that the state court will decide.

In summary, the Objection is based on a very selective reading of the Shareholders Agreement, completely ignoring provisions which contradict the very assertions made in the Objection. The Objection also reargues whether BHC should be allowed to purchase shares. It cannot be denied that the interest Dietrich claims to hold by virtue of the Shareholders Agreement is the subject of a bona fide dispute. Nor can it be denied that under the provisions of the Shareholders Agreement, Dietrich

was terminated for cause as determined by the board and can be compelled to accept money in exchange for his stock. He can argue about the price he is to receive but that is all. Under the circumstances, the requirements of subsections four and five of section 363 of the Bankruptcy Code happy and satisfied, the Objection should be overruled, and the Sale Motion should be approved.

Respectfully submitted,

/s/ Timothy P. Neumann
TIMOTHY P. NEUMANN